FILED
2014 Jun-18  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

JOHN THOMAS CHANDLER,                )
                                     )
              Plaintiff              )
                                     )
       vs.                           )        Case No. 4:13-cv-00447-LSC-HGD
                                     )
ALABAMA DEPARTMENT OF                )
CORRECTIONS, et al.,                 )
                                     )
              Defendants             )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

John Thomas Chandler, hereinafter referred to as plaintiff, has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States were abridged during his incarceration at St. Clair Correctional Facility in Springville, Alabama. Plaintiff has since been released from custody.  Plaintiff names the following entities and individuals as defendants:   Alabama Department of Corrections (ADOC); Corizon Medical Services (Corizon); ADOC Commissioner Kim T. Thomas; Warden Carter Davenport; Deputy Warden Joseph Headley; Deputy Warden Patrice Richie; Chief Kitchen Steward Willa Mitchell; Kitchen Steward Tracey Williams; I.C.S.

Officer Jeffery Bishop; Prison Store Supervisor Catrina Willett; Corizon CEO Rich Hallworth; Corizon Alabama Director Ken Dover; Corizon Alabama Director Larry Linton; Dr. William Talley; Dr. David Pavlakovic; Corizon employee John or Jane Doe; Nurse Debra Sanders; Nurse Practitioner Anissa Thomas; Caleine Oakes; Nurse Meeks; Nurse Cindy Doe; Nurse Linda Doe; Corizon employee Jim or Dianne Doe; Nurse Sue Doe; Nurse Joseph Guthrey; and C.W.G.  Plaintiff seeks monetary relief. In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, § 804, 110 Stat. 1321, and 28 U.S.C. § 1915A, requires this court to screen complaints filed by prisoners against officers or employees of governmental entities and to dismiss the complaint or any portion of the complaint that it finds frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.  Thus, under § 1915A, the court may *sua sponte* dismiss a prisoner's complaint prior to service.  Nevertheless, in order to protect a *pro se* prisoner's right of access to the courts, these complaints are read by less stringent standards than formal pleadings drafted by lawyers.  *Haines v. Kerner*,

404 U.S. 519, 520-21 (1972); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984); *Watson v. Ault*, 525 F.2d 886, 891 (5th Cir. 1976).

## I.  FACTUAL ALLEGATIONS

When the events made the basis of this complaint occurred, plaintiff was 51 years old and had been incarcerated for about 23 years.  (Compl. at 4.)  Plaintiff had been classified as Class 2 medical status because of previous surgeries and a history of seizures.  (*Id.*)  It is customary in the Alabama Department of Corrections for Class 2 medical inmates to be excused from institutional jobs.   (*Id.*)  If they are assigned institutional jobs, the jobs are light duty such as dorm cleaners, runners, sweeping, or mopping.  (*Id.*)  Plaintiff contends that since prisons are overcrowded and there are more inmates than jobs, it is unnecessary for Class 2 inmates to be assigned jobs at all.  (*Id.*)  However, prison staff at St. Clair Correctional Facility prefer to "force older inmates, even inmates with medical problems, to work" because they do not cause as many problems as younger inmates.  (Compl. at 9, 11.)

On March 12, 2011, Chief Kitchen Steward Willa Mitchell called plaintiff to the prison kitchen and informed him that he was assigned to work there.  (*Id.* at 11.)  Plaintiff responded that he had a Class 2 medical status and suffered from seizures.  (*Id.*)  Defendant Mitchell told plaintiff that I.C.S. Officer Jeffrey Bishop assigned

plaintiff to the kitchen and Bishop was the only person who could change the assignment. (*Id*.)

Plaintiff went to defendant Bishop's office and told Bishop that he had a Class 2 medical status and suffered from seizures. (*Id*.)  Defendant Bishop held up a document stating that Corizon Medical Services cleared plaintiff for kitchen duty. (Compl. at 11).  Plaintiff began working in the kitchen as directed. (*Id*.)

Kitchen Steward Tracey Williams was plaintiff's immediate supervisor. (*Id*.) Defendant Williams assigned plaintiff to the serving line, where plaintiff worked until about March 31, 2011. (*Id*.)   Although there were younger, healthier inmates available, defendant Williams ordered plaintiff to work in the kitchen dish room. (Compl. at 11-12).  Plaintiff alleges that working in the dish room was "extremely stressful and physically demanding." (Compl. at 12).  Plaintiff was required to "run back and forth from the dish room to the serving line carrying stacks of food trays, cups, etc." during the entire three- to four-hour shift. (*Id*.)

On March 31, 2011, plaintiff slipped on the slick tile floor and twisted his right knee. (*Id*.)  Plaintiff did not realize the severity of his injury until the morning of April 1, 2011. (*Id*.)  That morning, plaintiff was in pain, and it was difficult for him to walk. (*Id*.)  At about 9:30 a.m., defendant Williams called for plaintiff to report to work. (Compl. at 12).  Plaintiff notified defendant Williams that he had injured his

knee the day before while working in the dish room.  (*Id*.)  Defendant Williams did not complete an incident report as required by ADOC regulations.  (*Id*.) Neither did defendant Williams assist plaintiff in getting medical attention.  (*Id*.)  Instead, defendant Williams told plaintiff that she needed him to work and unless he had an order from a doctor, he would be placed in lock-up if he failed to work.  (*Id*.)  As a result, plaintiff reported to work despite his injury.  (*Id*.)

On April 3, 2011, plaintiff submitted a sick call request. (Compl. at 13). Nurse Debra Sanders saw plaintiff on April 5, 2011.  (*Id*.)  Although plaintiff's injury occurred on his assigned prison job, defendant Sanders charged plaintiff a $3.00 medical co-payment.  (*Id*.) Defendant Sanders scheduled an appointment for plaintiff to see Dr. William Talley on April 14, 2011.  (*Id*.)

On April 11, 2011, when plaintiff could no longer tolerate the pain, he told defendant Williams that he was unable to work and that he did not care what the consequences were. (*Id*. at 13).  Although plaintiff informed defendant Williams that he was in pain, she "harrassed [sic] plaintiff everyday" by calling plaintiff's dormitory and asking the officer to send plaintiff to the kitchen.  (*Id*.)  Plaintiff would walk to the kitchen only to tell defendant Williams that he was not going to work.  (Compl. at 13).

On April 14, 2011, Dr. Talley examined plaintiff's knee but did not x-ray plaintiff's knee or schedule plaintiff for an MRI. (*Id*.) Dr. Talley ordered that plaintiff use crutches for two weeks and prescribed him Motrin for pain. (*Id*.) Dr. Talley stated that he would order an MRI for plaintiff's knee at a later date. (*Id*. at 14.) Dr. Talley also excused plaintiff from work for two weeks and scheduled him for a follow-up appointment and x-ray in two weeks. (*Id*. at 13.) Plaintiff was not seen for the follow-up appointment and he did not receive an x-ray until months later. (Compl. at 13-14). As of the date of plaintiff's complaint, he had not received an MRI. (*Id*. at 14).

Plaintiff's knee did not improve after being on crutches for two weeks. (Compl. at 14). However, plaintiff returned to work. (*Id.*) After working for two days in pain, plaintiff refused to return to work. (*Id*.)

On May 7, 2011, plaintiff filed a grievance because Dr. Talley had not called plaintiff back for his two-week follow-up appointment. (*Id*.) Caleine Oakes responded that plaintiff was scheduled to see Dr. Talley, but did not state when. (*Id*.)

On May 15, 2011, plaintiff still had not been called to the infirmary for his two-week follow-up appointment. (Compl. at 14). Plaintiff filed a second grievance. (*Id*.) Defendant Oakes responded that plaintiff was scheduled to see Dr. Talley but,

again, failed to state when.  (*Id*.)  During this time, defendant Williams continued to call plaintiff daily requesting that he return to work.  (*Id*.)

On May 17, 2011, Dr. Talley examined plaintiff.  (*Id*.)  Dr. Talley gave plaintiff a shot in his knee and stated that it would stop the pain.  (Compl. at 15).  However, plaintiff's pain continued.  (*Id*.)

On May 18, 2011, defendant Williams called plaintiff to the kitchen to work. (*Id*.)  After one day of work, plaintiff again refused to work due to the pain in his knee.  (*Id*.)

On May 22, 2011, plaintiff submitted another sick call request.  (Compl. at 15). Defendant Sanders scheduled plaintiff for an appointment with Dr. Talley on May 25, 2011.  (*Id*.)

On May 25, 2011, Dr. Talley examined plaintiff and diagnosed him with arthritis.  (Compl. at 15).  Plaintiff reminded Dr. Talley that he recommended plaintiff have an MRI.  (*Id*.)  Dr. Talley stated that an MRI was unnecessary and that plaintiff needed knee replacement surgery.  (*Id*.)  Dr. Talley ordered plaintiff a walking cane, elastic knee sleeve, and prescribed him Motrin.  (*Id*.)  Dr. Talley also issued plaintiff a profile for no prolonged standing or walking.  (*Id*.)  He stated that he would order that plaintiff not work in the kitchen.  (*Id*.)  However, Dr. Talley did not issue the order.  (Compl. at 15).

By June 10, 2011, plaintiff had been limping and favoring his right knee for so long that plaintiff's left knee started hurting as badly as his right knee. (*Id.*) On the same day, plaintiff submitted a sick call request. (Compl. at 15-16). Defendant Sanders screened plaintiff and again charged him a $3.00 co-payment. (*Id.* at 16). Defendant Sanders scheduled an appointment for plaintiff with Dr. Talley. (*Id.*)

On June 16, 2011, Dr. Talley examined plaintiff and told him that the pain in his left knee was caused by plaintiff favoring his right knee and putting most of his weight on his left leg. (*Id.* at 16). Dr. Talley prescribed Tylenol for pain in addition to plaintiff's prescription for Motrin. (*Id.*) Plaintiff expressed his concern to Dr. Talley that he would also damage his left knee and need knee replacement surgery for both knees. (*Id.*) Plaintiff requested that Dr. Talley order knee replacement surgery for plaintiff's right knee. (Compl. at 16). Dr. Talley responded, "They are not going to give you knee replacement surgery with you having only 22 months before you get out[.] If you had several years remaining, they would probably do it." (*Id.*) Dr. Talley further informed plaintiff that even if he did have knee replacement surgery, knee pain is something that plaintiff would have for the rest of his life. (*Id.*) Dr. Talley also stated that since plaintiff injured his knee while working in the prison kitchen, plaintiff "may have an issue with DOC." (*Id.*)

On August 17, 2011, plaintiff filed a grievance, requesting knee replacement surgery.   (Compl. at 26).   Defendant Oakes responded that there was no documentation that an orthopedic consult had been ordered for plaintiff.   (*Id*.) Plaintiff contends that Oakes and Dr. Talley failed to schedule an orthopedic consult for him.  (*Id*.)

On September 15, 2011, plaintiff submitted a sick call request due to his continued knee pain.  (Compl. at 16).   Defendant Sanders screened plaintiff and informed him that he must see Nurse Practioner Anissa Thomas before he could see Dr. Talley.  (*Id*.)  Defendant Thomas examined plaintiff but refused to let him see Dr. Talley.  (*Id*. at 16-17).

On March 14, 2012, plaintiff submitted a sick call request in which he requested orthopedic shoes to alleviate the pain in his knees.   (Compl. at 17). Defendant Sanders screened plaintiff on March 19, 2012 and scheduled him for an appointment with Dr. Talley without first having to see defendant Thomas.  (*Id*.)

On March 21, 2012, Dr. Talley examined plaintiff.  (*Id*.)  Dr. Talley denied plaintiff's request for orthopedic shoes.  (*Id*.)  Dr. Talley did prescribe plaintiff a narcotic for pain relief.  (*Id*.)  He also told plaintiff that he would have plaintiff return to the infirmary in a couple of days and give him a shot in both knees.  (Compl. at 17).  However, Dr. Talley failed to call plaintiff back for the shots.  (*Id*.)

On March 26, 2012, plaintiff wrote a letter to Deputy Warden Joseph Headley, requesting his assistance in getting orthopedic shoes and knee replacement surgery. (Compl. at 26).  However, defendant Headley ignored plaintiff's request.  (*Id*.)

On May 5, 2012, plaintiff filed a grievance concerning his medical treatment. (*Id*.)  Defendant Oakes responded and stated that on March 21, 2012, Dr. Talley ordered that plaintiff return for a follow-up visit in four weeks.  (*Id*.)

On May 7, 2012, plaintiff filed another grievance because he still had not returned to the infirmary for his follow-up visit with Dr. Talley.  (Compl. at 18). Defendant Oakes responded that on April 19, 2012, Dr. Talley ordered a follow-up visit with plaintiff.  (*Id*.)

On June 31, 2012, plaintiff saw Dr. Talley concerning his colonoscopy results. (*Id*.)  Plaintiff reminded Dr. Talley that he was supposed to see plaintiff for a follow-up examination and give him shots in both knees.  (*Id*.)  Dr. Talley told plaintiff that the reason he did not call plaintiff back for the shots was because the medication was unavailable and, after three or four weeks, Dr. Talley had forgotten about the follow-up appointment.  (*Id*.)

On July 1, 2012, Dr. Talley called plaintiff into the infirmary for a shot in his knees.[1]  (Compl. at 18).  Dr. Talley advised plaintiff that "they" were low on the medication so he could only give plaintiff a shot in one knee.  (*Id*.)  Plaintiff elected to receive the shot in his right knee.  (*Id*.)

On July 10, 2012, plaintiff was called to the infirmary to see Dr. Talley.  (*Id*. at 18-19).  Plaintiff again told Dr. Talley that his left knee and hips were hurting because he had been favoring his right knee.  (*Id*. at 19).  Dr. Talley advised plaintiff that as soon as he was released from prison, he needed to have knee replacement surgery and plaintiff's left knee and hips would stop hurting.  (Compl. at 19).

On July 30, 2012, plaintiff had an appointment with Chronic Care Nurse Joseph Guthrey concerning his seizures.  (*Id*.)  Plaintiff told defendant Guthrey that he was experiencing pain in his knees and hips.  (*Id*.)  Defendant Guthrey responded that plaintiff would have to see Dr. Talley about his knee and hip pain because Guthrey only managed plaintiff's seizures.  (*Id*.)

On September 14, 2012, plaintiff was seen by Dr. David Pavlakovic who had replaced Dr. Talley.  (Compl. at 19).  Plaintiff asked Dr. Pavlakovic whether he would be undergoing knee replacement surgery.  (*Id*.)  Dr. Pavlakovic did not examine

---

[1] Plaintiff states that this visit occurred on June 1, 2012. (Compl. at 18).  However, the court assumes from the surrounding events that plaintiff meant to allege that this visit occurred on July 1, 2012.

plaintiff or look in plaintiff's medical files to determine what was wrong with plaintiff's knee.  (*Id*.)  Dr. Pavlakovic asked plaintiff how much time he had remaining in prison.  (*Id*.)  When plaintiff responded that he had eight months remaining, Dr. Pavlakovic stated that plaintiff did not have enough time left for Corizon to provide plaintiff with knee replacement surgery.  (*Id*. at 19-20.)

On September 17, 2012, plaintiff filed a grievance because he had not received knee replacement surgery.  (Compl. at 20).  C.W.G. responded and stated that Dr. Pavlakovic assessed plaintiff's knee and did not recommend surgery.  (*Id*.)  Plaintiff contends that Dr. Pavlakovic did not assess plaintiff's knee.  (*Id*.)

On October 5, 2012, plaintiff filed a grievance appeal.  (*Id*.)  He states, "The appeal was responded to with the same lies used to respond to the original grievance." (*Id*.)

On October 11, 2012, plaintiff sent a letter to Warden Carter Davenport requesting assistance in getting knee replacement surgery.  (Compl. at 25).  Plaintiff stated in the letter that the only reason Dr. Talley and Dr. Pavlakovic had not ordered the knee surgery was due to plaintiff's release date.  (*Id*. at 25-26).  Defendant Davenport responded that he was not a doctor and that he accepted the doctor's opinion.  (Compl. at 3.)

On October 15, 2012, plaintiff wrote ADOC Commissioner Kim Thomas and requested that Thomas assist plaintiff in getting knee replacement surgery. (Compl. at 24). Plaintiff did not receive a response from defendant Thomas. (*Id*.)

On the same date, plaintiff sent a letter to Rich Hallworth, CEO of Corizon, and requested help in obtaining knee replacement surgery. (Compl. at 25). Plaintiff also sent defendant Hallworth a copy of his letter to defendant Thomas requesting surgery. (*Id*.) Defendant Hallworth did not respond to plaintiff's request. (*Id*.)

On October 26, 2012, plaintiff filed a grievance because he had not been scheduled for an appointment with defendant Guthrey even though Dr. Pavlakovic ordered the appointment on September 14, 2012. (Compl. at 24). Nurse Meeks responded that defendant Guthrey did not see inmates with chronic pain. (*Id*.) However, defendant Guthrey is a chronic care nurse. (*Id*.) Defendant Meeks told plaintiff that he needed to return to Dr. Pavlakovic, but did not assist him in scheduling an appointment to see Dr. Pavlakovic. (*Id*.)

On November 7, 2012, plaintiff submitted a sick call request and asked for an MRI of his right knee and a knee brace. (Compl. at 20). On November 9, 2012, defendant Sanders screened plaintiff. (*Id*.) Defendant Sanders stated that the only information in plaintiff's file concerning a knee injury was "something about one of the x-rays taken of plaintiff's knee and all the different pain medications that had

been prescribed for plaintiff's knee." (*Id*.)  Defendant Sanders acknowledged that because plaintiff injured his knee while working in the prison kitchen, she and other nurses incorrectly charged plaintiff $3.00 co-payments for medical visits regarding plaintiff's knee.  (*Id*.)  Defendant Sanders scheduled an appointment for plaintiff to see Dr. Pavlakovic on November 12, 2012.  (*Id*. at 20-21).

On November 12, 2012, Dr. Pavlakovic examined plaintiff concerning his knee pain. (Compl. at 21).  Dr. Pavlakovic told plaintiff that ADOC would not allow him to provide plaintiff with a knee brace.  (*Id*.)  Plaintiff stated that Corizon had provided inmates with velcro knee braces, as well as knee braces with metal rods. (*Id*.)  Dr. Pavlakovic agreed to order plaintiff a velcro knee brace.  (*Id*.)

Dr. Pavlakovic again asked plaintiff how long it would be before he was released from prison. (Compl. at 21).  Plaintiff responded that he would be released in six months.  (*Id*.)  Dr. Pavlakovic asked plaintiff what tests had been performed on his knee.  (*Id*.)  Plaintiff stated that there had been a visual and "hands on" examination and x-rays. (*Id*.)  Dr. Pavlakovic stated, "You mean to tell me that they have never sent you out for an MRI[?]" (*Id*.)  When plaintiff responded no, Dr. Pavlakovic stated, "Well[,] I am ordering you one." (Compl. at 21).  However, plaintiff did not receive an MRI or knee brace.  (*Id*.)

On November 27, 2012, "something in plaintiff's knee popped out of place . . ." and he was sent to the infirmary. (*Id*. at 21-22). Dr. Pavlakovic determined that plaintiff's knee was not out of place but rather his ligaments were causing the problem. (*Id*. at 22). Dr. Pavlakovic ordered Nurse Sue Doe to provide plaintiff with an ace bandage which provided more support for plaintiff's knee than the elastic knee sleeve. (*Id*. at 22). Dr. Pavlakovic gave plaintiff a shot and some pain medication. (*Id*. at 22). Dr. Pavlakovic did not send plaintiff out for an MRI. (*Id*.)

Plaintiff told defendant Sue Doe that Dr. Pavlakovic ordered a velcro knee brace for him on his previous visit. (Compl. at 22). Defendant Sue Doe responded that Corizon did not issue any knee brace except an elastic knee sleeve. (Compl. at 22). Plaintiff told defendant Sue Doe that other inmates at St. Clair had velcro knee braces and braces with metal rods. (*Id*.) Defendant Sue Doe refused to issue plaintiff a velcro knee brace. (*Id*.)

On December 12, 2012, "something in plaintiff's knee popped out of place again." (*Id*.) Plaintiff was seen in the infirmary on December 13, 2012. (Compl. at 22-23.) Nurse Cindy Doe required plaintiff to pay a $3.00 co-payment before he could receive medical attention. (*Id*. at 23). Defendant Cindy Doe was "hostile" towards plaintiff and told officers that there was nothing wrong with plaintiff's knee even though Dr. Pavlakovic ordered her to give plaintiff a shot and pain medication.

(*Id*.) Dr. Pavlakovic also ordered Defendant Cindy Doe to give plaintiff a velcro knee brace, but she ignored his order.  (*Id*.)

On December 18, 2012, plaintiff filed a grievance because he was charged $3.00 for his visit to the infirmary on December 12, 2012. (Compl. at 25).  Plaintiff also complained that he had not received the velcro knee brace Dr. Pavlakovic ordered for him. (*Id*.) Defendant C.W.G. responded to plaintiff but refused to refund plaintiff's money. (*Id*.) Defendant C.W.G. also told plaintiff that he had been cleared of a knee injury. (*Id*.)

On December 19, 2012, Dr. Pavlakovic informed plaintiff that he would again order an MRI for plaintiff since he did not receive the one Dr. Pavlakovic requested previously. (*Id*.) Dr. Pavlakovic stated on his request that plaintiff's knee injury occurred while plaintiff was working in the prison kitchen. (*Id*.) Plaintiff did not receive an MRI. (Compl. at 23).

On December 14, 2012, plaintiff sent Deputy Warden Patrice Richie a letter, requesting that she assist plaintiff in getting defendant Willett, Prison Store Supervisor, to honor his medical profile prohibiting prolonged standing and walking. (Compl. at 24).  Plaintiff states that defendant Riche "[a]pparently refused plaintiff's request for assistance since defendant Willet continue[d] to refuse to honor plaintiff's profile." (*Id*.) Specifically, on December 27, 2012, and January 17, 2013, defendant

Willett refused to recognize plaintiff's medical profile, and plaintiff had to stand outside on a concrete sidewalk, with no place to sit, for an hour to an hour and a half to obtain store items. (*Id*. at 23). Plaintiff experienced severe pain and difficulty walking for several days. (*Id*.) Plaintiff contends that defendant Willett refused to honor his medical profile on other occasions, but these two incidents were the most egregious. (Compl. at 24).

Plaintiff practices "Native American spirituality." (Compl. at 26). He states that Native American religious ceremonies are performed daily and sweat lodge ceremonies are performed four times a year to purify the body and mind and to connect with the spirit world. (*Id*.) During sweat lodge ceremonies, participants are required to sit on the ground in a circle with their legs folded. (*Id*.) Since plaintiff's knee injury, he has been unable to participate in the ceremonies. (*Id*.) Plaintiff "feels extremely stressed, inferior, inadequate, and incomplete" because of his inability to participate in these ceremonies. (Compl. at 51). He further claims that he has experienced physical illnesses such as headaches, sinus problems, ear infections, and body aches because he is unable to participate in religious ceremonies. (*Id*.)

Plaintiff alleges that defendants' failure to provide him with adequate medical care violated his constitutional rights, various federal statutes, state law, and ADOC regulations. Plaintiff requests monetary damages.

## II.  DISCUSSION

### A.  Alabama Department of Corrections

Plaintiff names the Alabama Department of Corrections as a defendant. However, it is well settled that the Eleventh Amendment to the United States Constitution bars § 1983 claims in federal court against the state or an agency of the state.  *See Alabama v. Pugh*, 438 U.S. 781 (1978); *see also Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).   As the Supreme Court has stated:

> [T]here can be no doubt . . . that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit.  *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292 (1937).  Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I, sec. 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity."

*Alabama v. Pugh*, 438 U.S. at 782.  Accordingly, plaintiff cannot maintain a § 1983 action against the Alabama Department of Corrections and his claims against the Department are due to be dismissed.

### B.  Sovereign Immunity

To the extent plaintiff's constitutional claims are brought against state actors in their official capacities for money damages, such claims are due to be dismissed

under the doctrine of sovereign immunity.  As stated previously, the Eleventh Amendment to the United States Constitution bars 42 U.S.C. § 1983 claims against the state or an agency of the state.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Likewise, lawsuits against a state official in his or her official capacity are suits against the state when "the state is the real, substantial party in interest."  *Id*. at 101.

Based on the foregoing, plaintiff's constitutional claims against state actors, in their official capacities for monetary relief, are due to be dismissed.

## C.   Fifth Amendment

Plaintiff alleges that defendants have violated his Fifth Amendment rights.  The Fifth Amendment prohibits intrusion by the *federal government* on an individual's right to due process.  *See Jordan v. Mosley*, 298 Fed. App'x 803, 806 (11th Cir. 2008) (citing *Knoetze v. U.S. Dep't of State*, 634 F.2d 207, 211 (5th Cir. 1981) (Fifth Amendment protection extends to all persons within the United States, but attaches only when the federal government seeks to deny a liberty or property interest)).  In the present case, defendants are all state actors; therefore, plaintiff cannot allege a Fifth Amendment claim against them and such claim is due to be dismissed.[2]

---

[2]  The due process of law secured by the Fifth Amendment against federal government invasion is safeguarded *against the states* by the Fourteenth Amendment, which will be addressed herein.

D.   **Americans with Disabilities Act**

Plaintiff alleges that defendants violated the Americans with Disabilities Act (ADA) by failing to provide him with knee replacement surgery. The court assumes plaintiff intends to bring his claim under Title II of the ADA, 42 U.S.C. § 12132, which states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." To establish a *prima facie* case of discrimination under the ADA, "[a plaintiff] must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citation omitted). A plaintiff qualifies as disabled under the ADA if he has "(A) a physical or mental impairment that substantially limits one or more of the major life activities . . .; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(2).

Plaintiff does not allege he is physically disabled within the meaning of the ADA. Specifically, plaintiff complains of knee pain and his need for knee replacement surgery, but does not claim that he suffers from a physical impairment which substantially limits his ability to perform any major life activity. Indeed,

"[m]erely having an impairment does not make one disabled for the purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

Even if plaintiff could show that he is disabled within the meaning of the ADA, a denial of medical treatment, without more, is not an ADA violation. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) ("The Rehabilitation Act, like the ADA, was never intended to apply to decisions involving . . . medical treatment."); *see Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (the ADA is not a means to bring a claim of medical negligence, nor is it "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners"); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (finding that "purely medical decisions" do not ordinarily fall within the scope of the ADA).

Moreover, plaintiff does not allege that he was denied a reasonable accommodation for any alleged disability, denied services because of his disability, or was otherwise discriminated against by any defendant because of such disability.[3] As such, plaintiff's ADA claim is due to be dismissed.

## E.   **Religious Freedom**

Plaintiff claims that he was unable to participate in Native American religious ceremonies because he could not fold his legs due to his knee injury.   Because

---

[3]  Plaintiff acknowledges that he had a profile for no prolonged standing or walking.

defendants would not provide him with knee replacement surgery, plaintiff reasons that defendants violated the Religious Freedom Restoration Act of 1993 ("RFRA") and plaintiff's First Amendment right to freely exercise his religion.

### 1. RFRA

As an initial matter, the United States Supreme Court held the RFRA unconstitutional as applied to state and local governments because it exceeded Congress' power under § 5 of the Fourteenth Amendment. *See City of Boerne v. Flores*, 521 U.S. 507 (1997). Therefore, plaintiff's RFRA claim is due to be dismissed.

To the extent plaintiff seeks to allege a claim against defendants under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the successor to the RFRA, the same is also due to be dismissed. Plaintiff is no longer in the custody of the ADOC, so damages is his only potential relief. However, the United States Supreme Court has held that money damages are not available in suits against states under RLUIPA. *Sossamon v. Texas,* - - - U.S. - - -, 131 S.Ct. 1651, 1663 (2011). Neither can plaintiff recover monetary damages from defendants in their official capacities since a suit against a state official in his or her official capacity is a suit against the state and barred by sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Similarly, plaintiff cannot recover

monetary damages from defendants in their individual capacities under RLUIPA because the statute does not create "a private action against individual defendants for monetary damages." *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 131 S.Ct. 1651, 1657 n.3 (2001). Accordingly, to the extent plaintiff's RFRA claim can be construed as a claim under RLUIPA, it is due to be dismissed for failing to state a claim for relief.

### 2. First Amendment

The First Amendment provides, "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  The Free Exercise Clause of the First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  To demonstrate a free exercise violation of the First Amendment, an inmate mush show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which substantially burdens and significantly interferes with the practices of the inmate's religion or restricts his free exercise of a sincerely held religious belief.  *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (in the prison context, a plaintiff must demonstrate that prison officials have employed a policy or regulation, not reasonably related to

any legitimate penological interest or security measure, which burdens a practice of his religion or prevents him from engaging in conduct or having a religious experience which the faith mandates).

Plaintiff does not identify any policy or regulation that defendants employed which abridged his free exercise of religion. Rather, plaintiff merely complains that he could not cross his legs during Native American ceremonies because defendants would not afford him knee replacement surgery. It is obvious on the face of plaintiff's complaint that he was free to attend his religious ceremonies. Plaintiff's complaint that he was physically incapable of crossing his legs during the ceremonies does not state a First Amendment claim against defendants and is due to be dismissed.

## F.   <u>Conspiracy</u>

Plaintiff alleges defendants conspired to violate his constitutional rights by denying him adequate medical treatment. "In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed." *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984). A complaint may justifiably be dismissed because of the conclusory, vague, or general nature of the allegations of conspiracy. *Id.* The "naked assertion" of a conspiracy without "supporting operative facts" is not sufficient to state a claim under § 1983. *Phillips v. Mashburn*, 746 F.2d 782, 785 (11th Cir. 1984).

The plaintiff attempting to prove a § 1983 conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights. *Addickes v. S.H. Kress& Co.*, 398 U.S. 144, 152 (1970).  In other words, plaintiff must show some evidence of an agreement between the defendants. *Bailey v. Bd. of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir. 1992).

Plaintiff does not allege supporting operative facts that defendants conspired to deprive him of his constitutional rights. Specifically, plaintiff fails to show how these individuals "reached an understanding" to have his constitutional rights violated, and he has made only conclusory statements that a conspiracy among them existed. *Addickes*, 398 U.S. at152.  Therefore, plaintiff's conspiracy claims are due to be dismissed.

## G.   <u>Eighth Amendment – Medical Claims</u>

The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97 (1976).  Indeed, the conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *See Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977).  Mere negligence is insufficient to support a constitutional claim. *See Fielder v. Brossard*, 590 F.2d 105 (5th Cir. 1979).  Moreover, an accidental or inadvertent

failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980). Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. at 106. Neither will a mere difference of opinion between an inmate and the institution's medical staff as to treatment and diagnosis alone give rise to a cause of action under the Eighth Amendment. *See Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976); *see also Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976).

Deliberate indifference can be shown in a variety of ways. As the Eleventh Circuit Court of Appeals noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (internal citations omitted).

An official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening or urgent medical condition that would be exacerbated by delay.

*See Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186-87 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994). Delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations omitted).

"In contrast, delay or even denial of medical treatment for superficial, non-serious physical conditions does not constitute an Eighth Amendment violation." *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186-87 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). A medical need is considered serious when delay results in an inmate suffering "a lifelong handicap or permanent loss." *Monmouth County Corr. Inst. Inmates v. Lorenzo*, 834 F.2d 326, 347 (3rd Cir. 1987). An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Hill*, 40 F.3d at 1188, *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

## 1. Corizon Medical Services

To the extent plaintiff seeks to state a claim against Corizon Medical Services based on the conduct of its employees, such claim is due to be dismissed. Plaintiff

cannot state a claim for relief against a corporation based on the actions of its employees. Specifically, while a corporation providing prison medical services may be liable under § 1983 if it is established that the constitutional violation was the result of the corporation's policy or custom, such a corporation may not be held liable under § 1983 on the basis of *respondeat superior. See Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1986); *Monell v. Dept. of Soc. Serv*., 436 U.S. 658 (1978). Instead, a plaintiff must allege that the corporation has a policy, practice, or custom that represents official policy that resulted in the alleged discouragement, delay or denial of medical treatment to inmates so as to deny plaintiff his constitutional rights. *See Berdin v. Duggan*, 701 F.2d 909, 914 (11th Cir. 1983). Additionally, a plaintiff must plead more than a blanket assertion that a policy or practice existed; he must specifically identify which policy or practice, if any, caused his injuries. *See Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999). Furthermore, the Eleventh Circuit has stated that "[t]o establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *Id*. The Eleventh Circuit has defined "custom" to mean "a practice that is so settled and permanent that it takes on the force of law." *Wayne*, 197 F.3d at 1105.

Plaintiff fails to allege in his complaint that Corizon maintained a policy or custom which contributed in any way to the claimed constitutional violations.

Therefore, plaintiff's Eighth Amendment medical claim against Corizon is due to be dismissed for failing to state a claim upon which relief may be granted.

### 2.  Corizon Alabama Directors Ken Dover and Larry Linton

Plaintiff alleges that Corizon's Alabama Directors Ken Dover and Larry Linton are "liable for . . . tortuous [sic] acts" and are "vicariously . . . responsible for the acts and omissions of [their] agents . . . employees, or representatives of Corizon Medical Services . . . ." (Compl. at 33-34).  As stated previously, a prisoner cannot rely on doctrines of vicarious liability or *respondeat superior* in establishing liability pursuant to § 1983.  *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 90-92 (1978); *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995).  While "the doctrine of *respondeat superior* does not apply to § 1983 cases, a § 1983 plaintiff may maintain a theory of direct liability against a prison or other official if that official fails to properly train, supervise, direct, or control the actions of a subordinate who causes the injury." *Pearl v. Dobbs*, 649 F.2d 608, 609 (8th Cir. 1981).  "Supervisory liability under section 1983 may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation."  *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). "A single incident, or isolated incidents, do not ordinarily satisfy this burden." *Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1988).

Plaintiff does not allege that defendants Dover and Linton had any direct involvement with his medical treatment. Additionally, plaintiff has not demonstrated a history of widespread abuse such that defendants Dover and Linton were on notice of the need to correct an alleged deprivation but failed to do so. Neither does plaintiff allege facts to show that defendants Dover and Linton maintained customs or policies that resulted in violation of plaintiff's constitutional rights or that they directed their subordinates to act unlawfully or knew they would act unlawfully and failed to stop them from doing so. Accordingly, plaintiff's supervisory liability claims against Dover and Linton are due to be dismissed.

### 3. Corizon Employees Jane/John Doe, Linda Doe, & Jim/Dianne Doe

Plaintiff claims that John or Jane Doe, Linda Doe, and Jim or Dianne Doe were Corizon employees "at the time of the acts and omissions" made the basis of the complaint. (Compl. at 35, 37). However, plaintiff fails to assert any specific factual allegations against these defendants. Vague, general or conclusory allegations are insufficient to merit relief under 42 U.S.C. § 1983, much less a complete lack of any allegation. *See Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984). Even under the so-called notice rules of pleading, the complaint must state a cause of action sufficient to affirmatively show the plaintiff is entitled to relief, since "[i]t is not enough, to indicate merely that the plaintiff has a grievance but sufficient detail must be given so that the defendant, and the Court, can obtain a fair idea of what the plaintiff is complaining, and can see that there is some legal basis for recovery." *Id*. at 556 (citations omitted). Because of plaintiff's failure to state any factual allegations against Jane/John Doe, Linda Doe, and Jim/Dianne Doe, these defendants are due to be dismissed.

### 4. Nurse Sanders & Nurse Cindy Doe – Medical Co-payments

Plaintiff complains that Nurse Sanders and Nurse Cindy Doe charged him co-payments for medical services. He argues that since he injured his knee while working in the prison kitchen, he should not have been charged co-payments.

Plaintiff's complaints against Nurse Sanders and Nurse Cindy Doe regarding medical co-payments do not state a claim for relief.  A prisoner does not have a "general constitutional right to free health care." *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997).  It is not deliberate indifference for a prison medical provider to require a prisoner to pay a co-payment before receiving care when he has the ability to pay.  *See Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012). "[S]uch a requirement simply represents an insistence that the prisoner bear a personal expense that he or she can meet and would be required to meet in the outside world." *Reynolds*, 128 F.3d at 174.

Although plaintiff cannot be denied health care based on his inability to pay, he does not argue that he was unable to pay the co-payment.  Neither does he allege that he was denied medical treatment due to any inability to pay the co-payment.  Therefore, plaintiff has failed to state a cognizable claim for relief against Nurse Sanders and Nurse Cindy Doe concerning his medical co-payments.

### 5.  Nurse Practitioner Anissa Thomas

Plaintiff alleges that he submitted a sick call request on September 15, 2011, concerning his knee pain.  Defendant Sanders screened plaintiff and informed him that he must see Nurse Practioner Anissa Thomas before he could see Dr. Talley.  Defendant Thomas examined plaintiff, but refused to let him see Dr. Talley.

Plaintiff does not allege that defendant Thomas provided him with inadequate medical care or refused to provide him with medical treatment altogether. His only complaint is that he was not allowed to see the doctor as he wished. The fact that plaintiff simply preferred another member of the medical staff to examine him does not state a constitutional claim. As such, plaintiff's Eighth Amendment medical care claim against defendant Thomas is due to be dismissed.

### 6. Chronic Care Nurse Joseph Guthrey

Plaintiff claims that on July 30, 2012, he had an appointment with Chronic Care nurse Joseph Guthrey concerning his seizures. Plaintiff told defendant Guthrey that he was experiencing pain in his knees and hips. However, defendant Guthrey responded that plaintiff would have to see Dr. Talley about his knee and hip pain because Guthrey only managed plaintiff's seizures.

Plaintiff's allegations are insufficient to state a claim against defendant Guthrey. He acknowledges in his complaint that defendant Guthrey was a chronic care nurse who monitored plaintiff's seizures. Plaintiff does not allege that defendant Guthrey was responsible for handling any of plaintiff's other medical conditions. There is no indication that defendant Guthrey displayed deliberate indifference to plaintiff's medical needs by simply referring him to Dr. Talley concerning his knee

and hip pain.  As such, plaintiff's claims against defendant Guthrey are due to be dismissed.

### 7.  Defendants Mitchell, Williams & Bishop

Plaintiff alleges that on March 12, 2011, Chief Kitchen Steward Willa Mitchell, Kitchen Steward Tracey Williams, and I.C.S. Officer Jeffery Bishop forced him to work in the prison kitchen even though he was on Class 2 medical status and suffered from seizures.  However, plaintiff concedes in his complaint that Corizon had cleared him for kitchen duty.  Plaintiff has not alleged any facts showing that Mitchell, Williams, and Bishop knew he was medically unfit for kitchen duty and disregarded such risk and forced him to work anyway.

On March 31, 2011, plaintiff slipped on a tile floor while working and injured his right knee.  Plaintiff states that defendant Williams failed to write an incident report concerning his injury.  Defendant Williams's failure to write an incident report does not state a claim for relief.  To the extent Williams violated an ADOC regulation by failing to write an incident report after plaintiff's injury, the mere fact that agency regulations or procedures have been violated does not by itself raise a constitutional issue.  *Sandin v.* Connor, 515 U.S. 472, 481-82 (1995) (prison regulations are not intended to confer rights or benefits on inmates but are merely designed to guide

correctional officials in the administration of prisons); *United States v. Caceres*, 440 U.S. 741 (1979).

Plaintiff further alleges that even though he could not work after his injury, defendant Williams repeatedly called for plaintiff to report to work and stated that unless he had an order from a doctor, he had to work or go to lock-up.  As a result, plaintiff continued to work under threat of disciplinary action.  However, plaintiff was in so much pain that he later discontinued working altogether.  He alleges that defendant Williams "harassed" him every day to return to work and did not assist him in getting medical treatment for his knee.  (Compl. at 13).

Plaintiff's assertion that Williams ordered him to work unless he had a doctor's order fails to state a claim for relief.  By plaintiff's own admission, he injured his knee on March 31, 2011, but did not seek medical attention until April 3, 2011.  He did not see a physician until April 14, 2011.  During this time, there were no documented medical restrictions for plaintiff working in the kitchen.  Plaintiff has not alleged sufficient facts to support an inference that defendant Williams knew about and disregarded a serious risk of harm to plaintiff when she ordered that plaintiff continue working unless he had a doctor's order.  Moreover, plaintiff alleges that he subsequently stopped working in the kitchen on April 11, 2011 without regard for the

disciplinary consequences. He does not allege that he was ever placed in lock-up for refusing to work.

Additionally, plaintiff's complaints that defendant Williams did not assist him in getting medical attention for his injured knee fail to state a claim for relief. Plaintiff does not allege that he was unable to seek medical attention on his own or that defendant Williams had any duty to seek medical attention on plaintiff's behalf when he was able to do so himself. Plaintiff contends that he submitted a sick call slip on April 3, 2011, and was seen by Nurse Sanders who arranged for plaintiff to see Dr. Talley on April 14, 2011. Therefore, plaintiff was perfectly capable, both mentally and physically, to request medical treatment on his own.

To the extent defendant Williams irritated plaintiff with her "harass[ing]" orders to return to work, verbal harassment does not amount to a constitutional violation. *Hernandez v. Florida Dep't of Corrections*, 281 F. App'x 862, 866 (11th Cir. 2008) ("verbal abuse alone is insufficient to state a constitutional claim"); *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (holding that prisoner's allegations that prison staff harassed him generally did not state a constitutional violation). Therefore, plaintiff's allegations of harassment against defendant Williams are due to be dismissed for failing to state a claim for relief.

Based on the foregoing, plaintiff's claims against defendants Mitchell, Williams, and Bishop are due to be dismissed for plaintiff's failure to state a claim for relief against them.

### 8. Corizon CEO Rich Hallworth, Dr. William Talley, Dr. David Pavlakovic, Nurse Cindy Doe, and Nurse Sue Doe and ADOC Defendants Commissioner Kim Thomas, Warden Carter Davenport, Deputy Warden Joseph Headley, Deputy Warden Patrice Richie, and Prison Store Supervisor Catrina Willett

Plaintiff alleges that Corizon defendants Hallworth, Talley, Pavlakovic, Thomas, Cindy Doe, and Sue Doe failed to provide him with adequate medical care in violation of the Eighth Amendment. Plaintiff claims that he notified ADOC defendants Thomas, Davenport, and Headley that he was being denied adequate medical care, but they refused to obtain treatment for him.

Plaintiff further contends that defendant Willett violated his Eighth Amendment rights by disregarding his medical profile which prohibited prolonged standing and forcing him to stand in line for up to one and a half hours for commissary. Plaintiff claims that he notified Deputy Warden Patrice Richie that defendant Willett would not recognize his medical profile, but Richie failed to correct Willett's unlawful behavior. At this juncture, plaintiff has alleged sufficient facts to require a Special Report from these defendants concerning such claims.

### H.   Fourteenth Amendment

#### 1.  Equal Protection

Plaintiff vaguely alleges that defendants violated his Fourteenth Amendment right to equal protection. To allege a cognizable claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must allege that he is similarly situated with other persons who were treated differently and that the reason for the differential treatment was based on race, religion, national origin, or some other constitutionally protected interest. *See Sweet v. Secretary, Dept. of Corrections*, 467 F.3d 1311, 1318-19 (11th Cir. 2006).  Moreover, to establish an equal protection violation, a plaintiff must establish the existence of intentional or purposeful discrimination.  *See Whitus v. Georgia*, 385 U.S. 545, 550 (1967).

Plaintiff does not allege that he was similarly situated with other persons who were treated differently and that the reason for the differential treatment was based on some constitutionally impermissible basis.  Therefore, plaintiff's Fourteenth Amendment equal protection claims are due to be dismissed.

#### 2.  Due Process

On May 7, 2011, plaintiff filed a grievance because Dr. Talley had not called plaintiff for his two-week follow-up appointment.  Caleine Oakes responded that plaintiff was scheduled to see Dr. Talley, but did not state when.  On May 15, 2011,

plaintiff filed a second grievance because he still had not been seen for his follow-up appointment.  Defendant Oakes responded that plaintiff was scheduled to see Dr. Talley but, again, failed to state when.

On August 17, 2011, plaintiff filed a grievance, requesting knee replacement surgery.  Defendant Oakes responded that there was no documentation that an orthopedic consult has been ordered for plaintiff.

Plaintiff contends that on September 17, 2012, he filed a grievance because he had not received knee replacement surgery.  Defendant C.W.G. responded and stated that Dr. Pavlakovic assessed plaintiff's knee and did not recommend surgery.

On October 26, 2012, plaintiff filed a grievance because he had not been scheduled for an appointment with defendant Guthrey.  Nurse Meeks responded that defendant Guthrey did not see inmates with chronic pain.  Plaintiff contends that defendant Meeks "demonstrated his . . . incompetence" because defendant Guthrey is a chronic care nurse.  (Compl. at 24).

On December 18, 2012, plaintiff filed a grievance because he was charged a $3.00 co-payment for his visit to the infirmary on December 13, 2012.  Plaintiff also complained that he had not received the velcro knee brace Dr. Pavlakovic ordered for him.  Defendant C.W.G. responded to plaintiff's grievance and refused to refund

plaintiff's money.  Defendant C.W.G. also told plaintiff that he had been cleared of a knee injury.

Plaintiff's allegations that defendants Oakes, Meeks, and C.W.G. did not sufficiently answer his grievances or denied his grievances altogether fail to state a cognizable constitutional claim under § 1983.   A state inmate has no constitutionally-protected interest in an administrative grievance procedure.  *See Bingham v. Thomas*, 654 F.3d 1171, 1177 (11th Cir. 2011) ("[A]n inmate has no constitutionally-protected liberty interest in access to [a prison grievance] procedure.").  Thus, denial of plaintiff's grievances did not violate his constitutional rights.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (holding that a prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983).

Neither can plaintiff allege an Eighth Amendment deliberate indifference claim against Oakes, Meeks, or C.W.G. concerning his medical care. Plaintiff does not assert that Oakes, Meeks, or C.W.G. personally participated in the allegedly unconstitutional denial of plaintiff's medical treatment.  For the same reason, the complaint does not establish that these defendants had subjective knowledge of a risk of serious harm to plaintiff or disregarded that risk when he or she responded to plaintiff's grievances.  *Bingham*, 654 F.3d at 1176.   Accordingly, plaintiff's

Fourteenth Amendment claims against Defendant Oakes, Meeks, and C.W.G. are due to be dismissed.

## I.   <u>State Law Claims</u>

Plaintiff alleges that defendants violated various Alabama state laws by denying him adequate medical care.  Plaintiff's claims for relief under the following Alabama statutes are due to be dismissed because these statutes either do not afford plaintiff a private cause of action or are not relevant to his claims:  Alabama Code §§ 6-2-34 (commencement of actions – six years), 6-5-300 (pleadings and proof regarding vicarious liability), 6-11-20 (standard of proof for award of punitive damages), 14-3-1 (duties of Board of Corrections generally), 14-3-13 (officers and guards – oath of office), and 14-3-30(b) (Department of Corrections financially responsible for medical treatment of inmates sentenced to DOC custody but housed in county jail) (1975).[4]

### 1.  Corizon Defendants

To the extent plaintiff asserts supplemental state law claims against Corizon Medical Services, Corizon Alabama Directors Dover and Linton, Jane/John Doe, Linda Doe, Jim/Dianne Doe, Nurse Sanders, Oakes, Nurse Meeks, Nurse Practitioner

---

[4]  Plaintiff also cites Alabama Code "§ 6-5-40"; however, this code section does not exist.

Thomas, and C.W.G. concerning his medical care, such claims are subject to dismissal pursuant to 28 U.S.C. § 1367(c)(3) once plaintiff's § 1983 claims against these defendants have been dismissed, as recommended herein.

To the extent plaintiff alleges that Corizon defendants CEO Rich Hallworth, Dr. William Talley, Dr. David Pavlakovic, Nurse Cindy Doe, and Nurse Due Doe violated the Alabama Medical Liability Act, such claims are due to proceed since plaintiff has sufficiently stated claims under the Act to obtain a response from these defendants.

### 2. ADOC Defendants

Plaintiff's state law claims against ADOC Defendants Willa Mitchell, Tracey Williams, and Jeffery Bishop are subject to dismissal pursuant to 28 U.S.C. § 1367(c)(3) once plaintiff's § 1983 claims against these defendants have been dismissed, as recommended herein.

Plaintiff's state law claims against ADOC defendants Commissioner Kim Thomas, Warden Carter Davenport, Deputy Warden Joseph Headley, Deputy Warden Patrice Richie, and Prison Store Supervisor Catrina Willett under Alabama Code §§ 14-11-1 and 14-3-51 concerning excessive punishment are due to be referred to the magistrate judge for further proceedings.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS that the following claims are due to be DISMISSED for failing to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1):

1.  Plaintiff's claims against the Alabama Department of Corrections.

2.  Plaintiff's claims against defendants in their official capacities for monetary relief.

3.  Plaintiff's Fifth Amendment claims.

4.  Plaintiff's ADA claims.

5.  Plaintiff's RFRA claims.

6.  Plaintiff's RLUIPA claims.

7.  Plaintiff's First Amendment claims.

8.  Plaintiff's conspiracy claims.

9.  Plaintiff's Eighth Amendment medical care claims against defendants Corizon Medical Services, Alabama Directors Ken Dover and Larry Linton, Corizon employees Jane/John Doe, Linda Doe, and Jim/Dianne Doe, Nurse Practitioner Anissa Thomas, and Nurse Joseph Guthrey.

10. Plaintiff's Eighth Amendment medical claims against Nurse Sanders and Nurse Cindy Doe concerning medical co-payments.

11. Plaintiff's Eighth Amendment medical care claims against ADOC employees Willa Mitchell, Tracey Williams, and I.C.S. Officer Jeffery Bishop.

12. Plaintiff's Fourteenth Amendment equal protection and due process claims.

13. Plaintiff's claims under Alabama Code §§ 6-2-34, 6-11-20, 14-3-1, 14-3-13, 14-3-30(b) (1975).

14. Plaintiff's state law claims against Corizon Medical Services, Alabama Directors Ken Dover and Larry Linton, Corizon employees Jane/John Doe, Linda Doe, and Jim/Dianne Doe, Nurse Sanders, Caleine Oakes, Nurse Meeks, Nurse Joseph Guthrey, Nurse Practitioner Anissa Thomas, and C.W.G.

15. Plaintiff's state law claims under against ADOC employees Willa Mitchell, Tracey Williams, and I.C.S. Officer Jeffery Bishop.

The magistrate judge further RECOMMENDS that the following claims be

REFERRED to the undersigned magistrate judge for further proceedings:

1. Plaintiff's Eighth Amendment medical care claims against Corizon defendants CEO Rich Hallworth, Dr. William Talley, Dr. David Pavlakovic, Nurse Cindy Doe, and Nurse Sue Doe.

2. Plaintiff's state law claims under the Alabama Medical Liability Act against Corizon defendants CEO Rich Hallworth, Dr. William Talley, Dr. David Pavlakovic, Nurse Cindy Doe, and Nurse Sue Doe.

3. Plaintiff's Eighth Amendment medical care claims against ADOC defendants Kim Thomas, Warden Carter Davenport, Deputy Warden Joseph Headley, Deputy Warden Patrice Richie, and Prison Store Supervisor Catrina Willett.

4. Plaintiff's state law claims under Alabama Code §§ 14-3-51, 14-11-13 (1975) against ADOC defendants Kim Thomas, Warden Carter Davenport, Deputy Warden Joseph Headley, Deputy Warden Patrice Richie, and Prison Store Supervisor Catrina Willett.

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court.  **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.**  Failure to do so will bar any later challenge or review of the factual findings **or legal conclusions** of the magistrate judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*).  In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge.  The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed

before the magistrate judge, making his own determination on the basis of that record. The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is DIRECTED to serve a copy of this report and recommendation upon the plaintiff.

DATED this 18th day of June, 2014.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE